IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DEMETHIA A HILL, | ) | |
| | ) | |
| Plaintiff, | ) | 8:10CV463 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | MEMORANDUM AND ORDER |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Demethia A. Hill("Hill") seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act and for the payment of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. After carefully reviewing the record, the Commissioner's decision will be affirmed.

I. PROCEDURAL BACKGROUND

Hill applied for social security disability benefits on January 12, 2007, claiming a crushing injury to her left hand rendered her disabled and unable to work since November 3, 2006. (Social Security Transcript ("TR") at 100-110, 128). She claims her hand hurts and tightens, she has consistent pain radiating to her wrist and knuckles, and she has numbness extending up her arm. She also claims she suffers from depression and perhaps other mental problems; specifically, she states she is "down and depressed about a lot of things all the time," is fearful, people stare at her hand, and she no longer wants to go places. (TR 144, 147, 154). Her application for disability benefits was denied on February 20, 2007, (TR 54-57), and her request for reconsideration was denied on July 13, 2007. (TR 60-64).

Hill filed a hearing request on July 24, 2007. (TR 65). A hearing was convened before an Administrative Law Judge ("ALJ") on June 22, 2009. At the ALJ's request, Hill identified all her medical providers. The hearing was then adjourned until medical records from those sources could be gathered for the ALJ's review and consideration. (TR 25-31). Hill waived her right to counsel and was not represented at the hearing. (TR 27, 84).

The hearing was re-convened on September 28, 2009. Testimony was received from Hill and Gail Leonhardt, a vocational expert ("VE") who appeared at the ALJ's request. (TR 32-46). Hill again waived her right to counsel and proceeded without representation. (TR 34, 99).

The ALJ's adverse decision was issued on October 5, 2009. (TR 13-23). Hill submitted a *pro se* request for review by the Appeals Counsel on November 30, 2009. (TR 12). She retained counsel on February 3, 2010. (TR 7-10). Hill's request for review by the Appeals Council, presented through her attorney, was denied on October 21, 2010. (TR 1-6). Her pending complaint for judicial review and reversal of the Commissioner's decision was filed on December 23, 2010. Filing No. 1.

## II. THE ALJ'S DECISION.

The ALJ evaluated Hill's claims through the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920, (TR 82-90). The ALJ found:

1. Hill meets the insured status requirements of the Social Security Act through June 30, 2011.

2. Hill has not engaged in substantial gainful activity since November 3, 2006, the alleged onset date.

3.  Hill has the following severe impairment: a crushed left hand.

4.  Hill does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Based on the entire record, Hill has the residual functional capacity to sit, stand, and walk for 6 hours in an 8-hour workday, and to use her right, dominant hand to lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; but her ability to push or pull with her left upper extremity is limited and she cannot use her left hand at all.

6.  Hill is unable to perform her past relevant work.

7.  Hill was born on July 31, 1965 and on the alleged disability onset date, was 41 years old, which is defined as a younger individual under social security regulations.

8.  Hill has a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because irrespective of whether she has transferable job skills, Hill "not disabled" under the framework of the Medical-Vocational Rules.

10. Considering Hill's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Hill can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 3, 2006 through the date of this decision.

TR 18-22.

### III.   ISSUES RAISED FOR JUDICIAL REVIEW.

Hill claims the ALJ's decision was incorrect for the following reasons:

1. The ALJ failed to fully and fairly develop the record by failing to obtain work-related physical limitations from a treating or examining medical source.

2. The ALJ failed to fully and fairly develop the medical evidence regarding Hill's mental impairment by failing to order a consultative examination.

Filing No. 16.

### IV.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

As of September 28, 2009, the date of the social security hearing, Hill was forty-four years old, with a high school diploma and some college education. (TR 36-37). Hill can speak, read, and understand English. (TR 127).

Prior to November 3, 2006, Hill worked as a telephone solicitor, child care attendant, and packing plant laborer, her most recent employment being a full time position for Tyson Foods. (TR 172). Her job duties at Tyson Foods included picking up items and setting them on a conveyer belt. (TR 189).

Hill was involved in a motor vehicle rollover accident on November 3, 2006. She sustained scalp abrasions, and lacerations and injuries to her left hand. Hill is right-handed. (TR 204). Hill was transported to Creighton University Medical Center for assessment and treatment of her injuries.

When Hill arrived at the hospital, she could not recall whether she lost consciousness in the accident. (TR 205). She was evaluated for a head injury, and scored 13 on the Glasgow coma scale;[1] comprised of a verbal command score (for eye opening) of 3;[2] a verbal response score of 4;[3] and a motor response score of 6.[4] (TR 204). A total Glasgow score of 9 to 13 indicates moderate Traumatic Brain Injury.[5] However, Hill was under the influence of alcohol and somewhat agitated during the testing. (TR 205). A CT scan of her head was essentially normal. (TR 223).

> There is no evidence of hemorrhage, mass-effect, midline shift, extra-axial fluid collection, or fractures. There is no evidence of acute territorial infarct. The gray-white matter differentiation, ventricles and basilar cisterns are grossly normal. The orbits are grossly intact. There is patchy ethmoid opacification

---

[1] "The Glasgow Coma Scale is a quick, reproducible scoring system to be used during the initial examination to estimate severity of [Traumatic Brain Injury]." See THE MERCK MANUAL, Traumatic Brain Injury, at http://www.merckmanuals.com/professional/injuries_poisoning/traumatic_brain_injury_tbi/traumatic_brain_injury.html?qt=Glasgow coma scale&alt=sh.

[2] A verbal command score of 3 means Hill opened her eyes in response to verbal commands. Id.

[3] A verbal response score of 4 indicates Hill was disoriented, but answered questions. Id.

[4] A motor response score of 6 indicates Hill obeyed commands. Id.

[5] Id.

    otherwise the visualized paranasal sinuses are clear. The mastoid air spaces are clear bilaterally.

(TR 223).

Hill's left hand was examined. Duplicate testing for hand sensation yielded inconsistent results, perhaps because Hill continued to be agitated and refused to answer questions. (TR 206). A plastic surgeon[6] evaluated Hill's left hand injuries and concluded Hill had sustained a "[l]eft hand comminuted mid shaft 5th metacarpal fracture with degloving injury of the first web space and multiple hand lacerations. Questionable flexor tendon injury to the 4th and 5th fingers." (TR 213).

Surgery was performed by Jason Miller, MD, including the open reduction and internal fixation of Hill's left fifth metacarpal, debridement of soft tissue, complex closure of her hand wounds, and the repair of her third extensor tendon laceration. (TR 193-94, 210).

Hill was released from the hospital on November 5, 2006. She was prescribed an antibiotic, Keflex, to be taken for 10 days and Lortab for pain. She was instructed to keep her

---

[6]Hill questions the sufficiency of her care, claiming she was seen by only a "cosmetic surgeon." (TR 157). Plastic surgery is a "surgical specialty or procedure concerned with the restoration, construction, reconstruction, or improvement in the form, function, and appearance of body structures that are missing, defective, damaged, or misshapen," and it encompasses "both reconstructive and aesthetic surgery." See http://dictionary.webmd.com/terms/plastic-surgery. Plastic surgery of the hand is very specialized and seeks to repair and restore the strength, function and flexibility of a hand, including the wrist and fingers, following a traumatic injury. See http://www.plasticsurgery.org/reconstructive-procedures/hand-surgery.html.

left arm elevated and not use it for lifting, and was advised she could shower provided her left arm was kept in a plastic bag to keep the splint dry. (TR.194). She was scheduled to follow up with Dr. Miller on November 10, 2006. (TR 194).

Hill was scheduled to begin occupational therapy for range of motion and strengthening on December 5, 2006. However, when she arrived, she had extensive dried exudate along the suture lines of her hand lacerations, as well as some open wounds. She was referred to Physical Therapy for wound care. (TR 185). She reported her pain at rest as 0 out of 10, and with activity as 2-3 out of 10. (TR 190). Hill's physical therapy treatment consisted of whirlpool cleaning and substantial wound debridement. Once the hand was cleaned and debrided, open wound areas with granulation tissue were located on the long finger. (TR 182). She was instructed on how to perform a home exercise program, and was told to complete the program frequently during the day to increase her active range of motion and reduce the edema. (TR 190). After two physical therapy treatments, Hill returned to Occupational Therapy for strengthening and range of motion care. (TR 182).

As of January 17, 2007, after 17 sessions of Occupational Therapy, Hill was making "slow but steady progress in active range of motion and functional use of the left hand," and was demonstrating an "increased active range of motion with ability to manipulate small marbles with index and ring fingers." (TR 187). Hill reported "increased functional use of the left hand for light housekeeping activities." (TR 187).

Hill completed a Daily Activities and Symptoms Report on January 31, 2007. In response to questions within the report, Hill claimed she needed help pulling up her pants, zipping, or tying shoes, and stated she could not perform outside chores, clean her home, or babysit her grandchild. (TR 134-38).

Hill received both a physical and a mental residual functional capacity evaluation on February 13, 2007. Based on the physical RFC assessment, which was performed by Jerry Reed, MD, Hill was able to occasionally lift and/or carry up to 50 pounds and frequently lift or carry up to 25 pounds, can stand, walk or sit for a total of 6 out of 8 hours a day, and had a limited ability to push or pull, handle, finger, or feel with his left hand. (TR 249-255). Dr. Reed concluded Hill's complaints were only partially credible, and her condition would likely further improve and become "non-severe" within the following year. (TR 255).

The mental RFC assessment, which was performed by Linda Schmechel, PhD, revealed Hill was having mild "difficulties in maintaining social functioning," (TR 267), and "some difficulty adjusting to her physical condition. . . ." (TR 269). However, "her mental health difficulties are not of the severity to limit her from doing work activities," . . . and she "never pursued treatment for mental health concerns, and she was taking no medications for depression." (TR 269).

On March 27, 2007, after 28 treatments, Hill was discharged from Occupational Therapy because her insurance benefits were discontinued. (TR 245). Hill was instructed on alternative sites to obtain treatment, (TR 245), but Hill never obtained treatment from these alternative resources.

A disability report was completed on April 4, 2007. Hill reported that her hand was hurting more and the pain was constantly going down her wrist. She claimed her hand draws and tightens, and it hurts across the knuckles. Hill claimed "mentally I feel like my hand is messed up for life and people stare at it. I don't like to go places. . . . I feel down and depressed about a lot of things all the time, don't feel like I can make a difference." (TR 144). According to Hill's aunt:

> Hill suffers from several problems that qualify her. She is unable to function normally. She has lost contact with reality. Even though her physical health is failing her mental health has failed her. She is nervous and unorganized. Demethia has no motor skills. She has been in deep depression. She has lost touch with her every day surroundings. Demethia suffers from forgetfulness. Even though she is not old she is mostly senile. She has no sensitivity. Demethia is hysterical. She has a serious problem of neurosis resulting in failure to face reality. She also has severe and periodic headaches. She suffer back pains and the throbbing in the head from her car accident which has trigger these disabilities. Demethia is unable to perform any type job duties because she is constantly losing contact and misinterprets reality. Demethia is at this time disabled and has no support and is unable to work any type job. Demethia has no sensibility at this time. She needs physical and mental help professionally. Demethia has sudden attacks and is very nervous she also has a psychiatric disorder that is visible.

TR 148.

A second physical RFC assessment was performed on July 12, 2007 by Glen Knosp, M.D. Dr. Knosp placed greater restrictions on Hill's lifting ability, concluding she was limited to occasionally lifting or carrying no more than 25 pounds and frequently lifting or carrying no more than 10 pounds. But consistent with the first physical RFC, he concluded Hill remained able to stand, walk or sit for a total of 6 out of 8 hours a day, with a limited ability to push or pull, handle, finger, or feel with her left hand. (TR 272-74). Dr. Knosp concluded:

> Medical records indicate no other physical conditions that would affect her functional capacity, outside of the left hand injury that was improving when she stopped treatment. While the claimant would have difficulties with manipulating items with her left hand, she has full use of her right hand. The claimant is no longer able to do heavy lifting or manipulation of large objects which would require good use of both hands. The rest of her physical capacities are unaffected. Also, it is expected that the claimant will regain use of her left hand if she obtains medical care and treatment or takes part in a home exercise (ROM) program

TR 282.

Hill never requested or obtained treatment for depression or mental health symptoms,[7] and between March 27, 2007 and May 2009, received no treatment for her left hand injuries or limitations. (TR 169). On June 8, 2009, Hill sought treatment from the Charles Drew Health Center for chronic left hand pain radiating up her arm. She reported no mental health symptoms. (TR 282-83).

Hill claimed her hand pain occurred four days a week, reaching a 10 out 10 at its worst. She explained the pain in her second and fourth MCP joints was the worst. The examiner observed reduced grip and range of motion in the hand, and ordered an x-ray. (Tr. 283). The x-rays revealed "degenerative changes at the fourth MCP joint including heterotopic ossification," a "plate-screw fixation of an old fifth metacarpal fracture," and "evidence of acute fracture, dislocation, or acute osseous abnormality," with smooth articular surfaces and no focal irregularity. (TR 288). The examiner diagnosed chronic hand pain, and advised Hill to continue taking Tylenol Arthritis and to try heat and ice packs as well as arthritis creams to relieve her pain. (TR 282-83).

Hill completed updated interrogatory responses on June 22, 2009. She claimed her hand was hurting constantly and she stated she cannot work because she needs the use of both hands. She stated she was using Tylenol Arthritis for the pain and sometimes she soaked her hand in hot water. (AR 160-66).

---

[7]In response to the question, "have you seen or will you see a doctor/hospital/clinic or anyone else for emotional or mental problems that limit your ability to work?," Hill answered "Yes." But she did not clarify whether she had already seen, or was merely intending to see, a mental health provider. (TR 154). Despite numerous opportunities to do so, she never identified any care provider who provided evaluation or treatment for mental health issues.

-10-

Hill's hearing before the ALJ was held on September 28, 2009. Hill explained she had done volunteer work in a kitchen to keep her food stamps, (TR 38), but had significant pain. She claimed she was unable to lift or grip with her left hand. (TR 38). Hill testified that she lives in a house and cleans it herself, albeit slower than before her accident. (TR 40). She stated she sleeps only four hours a night and cannot work. (TR 41). During the hearing, Hill admitted she could possibly work eight hours a day as a store greeter or restaurant hostess. (TR 42).

After hearing Hill's testimony, the ALJ posed a hypothetical question to the VE. Consistent with the physical RFC performed by Dr. Knosp, the ALJ asked the VE to assume Hill had a crushed left hand, could lift 20 pounds occasionally and 10 pounds frequently with her right (dominant) hand, and could sit, stand and walk six out of eight hours a day; but she had only a limited ability to push and pull with her left upper extremity and is unable to use her left hand at all. Assuming these facts, the VE testified Hill could not perform her past relevant work. The VE testified that Hill could, however, perform the position of a greeter or hostess, with 12,000 such jobs available in the four-state region (Iowa, Nebraska, Missouri, and Kansas), and 367,947 jobs available nationally. (TR 45-46).

## V. ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision. A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed. Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir.

2006). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010).

Hill argues this case must be remanded because the ALJ failed to fully and fairly develop the record. "[T]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press [her] case." Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) (citing Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir.2004)). "It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001). But "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir.2004). "The ALJ must neutrally develop the facts. [She] does not, however, have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Stormo, 377 F.3d at 806.

Hill argues the ALJ erred by failing to obtain information regarding her work-related physical limitations from Hill's treating or examining medical source. On the record before the court, the ALJ's duty to develop the record did not extend as far as the claimant asserts. At the initial hearing, the ALJ asked Hill to identify all medical providers she saw for any of her alleged problems. The hearing was then continued, and it was not re-convened until the ALJ had

obtained records from each of those providers. Based on those records, it is clear that Hill saw no one on a regular or long-term basis for treatment of hand injuries or mental health issues. There is no evidence she saw any doctor for the hand injuries between the time of her initial surgery in November of 2006 until May or June of 2009, when she sought treatment for her hand from the Charles Drew Health Center. To the extent they existed, the ALJ accumulated and reviewed the treating provider's records, and in the context of those records and her consideration of Hill's credibility, ultimately relied on Dr. Knosp's physical RFC assessment when determining the extent of Hill's limitations. There is no indication that the record of Hill's hand injuries was undeveloped, or that the ALJ felt unable to make her assessment based on the information collected. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).

The ALJ's decision as to Hill's physical injuries is supported by substantial evidence. The ALJ's denial of Hill's disability claim ruling is not subject to remand for failing to seek treating provider opinions regarding Hill's physical limitations.

Hill also claims the ALJ erred by failing to order a consultative examination of Hill's mental impairments. An ALJ is not required to order a consultative evaluation of every alleged impairment. The ALJ is simply authorized to order such examinations if the existing medical sources do not contain sufficient evidence to make a determination. Therefore, the "issue is whether the record contained sufficient medical evidence for the ALJ to make an informed decision as to [Hill's] alleged mental impairment." Matthews v. Bowen, 879 F.2d 422, 424-425 (8th Cir. 1989).

Hill never claimed she could not work due to any mental impairment. She stated she was "down and depressed about a lot of things all the time," believed people were staring at her hand, and no longer wanted to go places. (TR 144, 147, 154). Her aunt painted a much more dismal picture of Hill's mental issues, stating Hill suffered from severe and periodic headaches,

-13-

and describing Hill as "unable to function normally," "nervous and unorganized" with "no motor skills," having "lost touch with her every day surroundings," "mostly senile," insensitive, "hysterical," neurotic, and unable to face reality. TR 148.

Despite these alleged severe mental health symptoms, Hill was never seen or treated for mental health problems, never complained of headaches or any mental health issues to the doctors she saw for her physical problems, and those doctors' records do not mention any complaints or observations of mental health symptoms. (TR 282-83). During the administrative hearing, Hill did not mention depression or mental health issues as limiting her ability to work. The ALJ expressly found that Hill's description of even her physical symptoms was only partially credible, specifically noting that Hill takes no prescribed medications for pain and despite making progress in occupational therapy following her accident and injury, she did not seek treatment from alternative sources after her insurance benefits ran out. The ALJ noted that Hill 's pre-hearing interrogatory responses (dated June 2009) state that she could perform household chores and personal hygiene; and she enjoys reading, watching television, and sitting outside in the afternoon.. The ALJ further explained that during the hearing, Hill acknowledged she may be able to work eight hours a day at a job that did not require use of her left hand, including the job of a greeter. The ALJ concluded:

> In sum, the overall weight of the evidence supports the above residual functional capacity. The record does not reflect recommendations to limit her activities and the evidence does not indicate the quality of the claimant's daily functioning has been affected as severely as she has alleged. Nor are there treating source opinions or objective findings in the record to show the claimant has such disabling limitations or is unable to perform any work.

TR 21.

Under the facts of record, particularly considered in the context of the ALJ's credibility determination which was fully explained in her opinion and supported by the record, (see, e.g., Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir.1999) (finding that activities such as driving, shopping, watching television, and playing cards were inconsistent with the claimant's complaints of disabling pain), the ALJ was not required to obtain a consultive mental health examination of Hill. Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003)(holding the ALJ did not err by failing to order a psychological evaluation where the claimant was prescribed antidepressants on one occasion, but did not raise the issue at his hearing, and never sought or was referred to mental health treatment); Matthews, 879 F.2d at 424-425 (holding the ALJ did not err in evaluating the claimant's psychological complaints without a consultative exam where the claimant did not allege she was disabled due to any mental impairment, her doctors never mentioned mental health concerns in their records, and the only evidence indicating any emotional problems was her testimony that she suffers from "nerves" and was prescribed an anti-depressant medication).

Upon review of the record as a whole, the court finds substantial evidence supporting the ALJ's decision. Accordingly,

IT IS ORDERED that the findings and conclusions of the ALJ are affirmed.

October 28, 2011.   BY THE COURT:

　　　　　　　　　　　　　　　　　　　　*s/ Cheryl R. Zwart*　　　　　　　
　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.